JOSÉ HERNÁNDEZ GARCÍA ET AL., Petitioners, *v.* PUERTO RICO LABOR RELATIONS BOARD, Respondent.

No. JRT-63-11.      Decided February 9, 1967.

*Gilberto Concepción de Gracia* for petitioners. *J. B. Fernández Badillo, Solicitor General, Luis M. Rivera Pérez,* and *Marta Ramírez de Vera* for respondent.

First Division composed of Mr. Justice Pérez Pimentel, as Chief Judge of Division, Mr. Justice Blanco Lugo, Mr. Justice Rigau, and Mr. Justice Ramírez Bages.

MR. JUSTICE RAMÍREZ BAGES delivered the opinion of the Court.

Petitioners question the power of the Labor Relations Board to designate a trial examiner to prepare a report containing conclusions of fact and of law, as well as his recommendations on the case, on the basis of the evidence received by another examiner who ceased in his post, after the hearings in this case had been held. They also allege that it

erred (a) in denying a hearing to argue orally their exceptions and objections to the examiner's report; (b) in construing subsection (g) of Art. IX of the collective agreement subscribed by the Unión de Trabajadores del Transporte y Ramas Anexas, Inc., and the Metropolitan Bus Authority, which provides that "the workers [laid off] shall be employed according to their order of seniority and satisfactory services in general, and, in case of a tie in these two qualifications, it shall be decided by drawing lots" because it disregarded the right of seniority; and (c) in dismissing the complaint against the Unión de Trabajadores del Transporte de Puerto Rico y Ramas Anexas, Inc., "in toto," in spite of having concluded that said Union was guilty of unfair labor practice in the case of Guillermo Petterson.

Petitioners are not right in the aforesaid contentions. A summary of the facts of the case and the grounds on which we base this conclusion follow.

—A—

*Facts of the Case*

In the collective agreement signed by the Unión de Trabajadores del Transporte y Ramas Anexas, Inc., and the Metropolitan Bus Authority, provision was specifically made regarding layoffs for economy reasons (see the text of subsection (g) of Art. IX of said agreement copied in footnote 4 of this opinion). As the Authority was aware upon accepting the increase in wages provided by the agreement that it was to stand considerable losses, it proceeded to take several measures to prevent them or at least to reduce them. Having been advised, after a research to that effect, that its maintenance expenses very much exceeded those of comparable enterprises in the United States, it decided to reduce personnel in the repair shop. It discussed this with said Union during five months, until finally the latter accepted

the reasonableness of the proposed reduction. In order to carry on said reduction the Authority adopted the following rules: (a) all workers who because of their age were eligible to compensation by the Social Security of the United States would be included; (b) and the record of absences of every employee would be taken into consideration. It was also decided to make an investigation to determine the employees with collateral income.

On June 2, 1961 the Authority notified a great number of its employees that it would do without their services. Office and administration personnel, and 56 persons who were included in the unit covered by the agreement were included. Some of these had been active in an organization which was against members of the governing board of the Union, while others had backed its president in the internal disputes of said organization. Some other members who were laid off were indifferent to said internal disputes of the Union.

On three different occasions, subsequent to the layoffs, the Authority needed vehicle washers and the Union recommended and the former reemployed two of the workers previously laid off. Afterwards the Authority needed mechanics for Diesel motors and requested the Union on the condition that they had a vocational diploma; the Union contacted the group of mechanics laid off, but only one of them had the required diploma and he was hired. The same thing happened when there was an opening for an attendant. When unskilled workers were needed they were chosen from the group which had been laid off. All of this was done on the basis of prior satisfactory work.

Guillermo Petterson was laid off when the Union informed the Authority that he had been suspended from membership because Petterson had offended the president of the Union through leaflets and other propaganda. As soon as the Union reconsidered its action, it reinstated Petterson as a member

and informed his employer. The latter reemployed him. The Union paid Petterson the wages he failed to receive while he was unemployed for said reason.

—B—

## Alleged Unfair Practices

On the basis of such facts, a group of workers laid off filed a complaint before the Labor Relations Board, and the latter's attorneys charged the Authority with several unfair labor practices consisting in that (1) upon designating the workers to be laid off it chose those who opposed the manner in which Union matters were dealt with—this was not proved; (2) Art. IX of the agreement was violated when the employer failed to discuss with the Union the matter of reduction and layoff of personnel—just the opposite was proved, except that the Union and the Authority, although they stated standards and criteria with respect to the matter, never mentioned or designated the specific persons to be laid off; (3) subsection (g) of Art. IX of the agreement was violated—we shall discuss this charge under the third error considered further on.

—C—

## Errors Assigned

1.—Petitioners allege that the Board lacked power to designate an examiner to prepare and transmit to the parties, on the basis of the transcript of evidence received by another examiner who ceased in his position after the hearings in this case were held, a report with conclusions of fact and of law, as well as his recommendations on the case.

When this question was raised by exception to the report of the second trial examiner, the Board held that its practice of substituting an official in circumstances analogous to those

in this case or of doing without the report of the official who ceases and in its stead issuing a recommended decision and order, responds to a necessity and is sanctioned by §§ 6 and 9 of Art. II of its Regulations (29 R.&R.P.R. §§ 64–7 and 64–10).[1]

Petitioners maintain that the Regulations of the Board empower it, in cases like the one at bar, to transfer the proceeding before itself but they do not specifically empower it to appoint an examiner for the purposes of preparing a report based on the evidence heard by another examiner; that such violation of its regulations prejudiced petitioners because the evidence was conflicting; and that the Regulations of the Board do not contain a provision similar to that of the Regulations of the National Labor Relations Board regarding the question in controversy.[2]

■ For the purposes of deciding, we must make a brief recital of the principles of law applicable. The conclusions and recommendations of the examiners serve merely

---

[1] (a) Said § 6 of Art. II of the Regulations of the Labor Relations Board, besides providing that hearings shall be conducted by a trial examiner who shall be appointed by the chairman of the Board, or by the Board itself, or by one of its members or any other designated person, provides that: "At any time the Board may designate another official examiner to take the place of the official examiner previously appointed."

(b) Section 9 of Art. II of said Regulations provides in part that: "During the pendency or upon the conclusion of any hearing and prior to the report of the official examiner, the Board may, upon entering a special order to that effect, transfer any hearing or proceeding to itself."

[2] Said Regulation provides that: "In the event the trial examiner designated to conduct the hearing becomes unavailable to the Board after the hearing has been concluded and before the filing of his intermediate report, the Board may transfer the case to itself for purposes of further hearing or issuance of an intermediate report or both on the record as made, or may request the Chief Trial Examiner to designate another trial examiner for such purposes." (29 C.F.R. § 102.36.) Section 5(c) of the Administrative Procedure Act (5 U.S.C.A. § 1004(c)) provides that: "The same officers who preside at the reception of evidence . . . shall make the recommended decision . . . except where such officers become unavailable to the agency."

as advice to the Labor Relations Board. It may afterwards decide on the questions in controversy on the basis of its own appreciation of the record without being bound to follow the examiners' report. The due process of law in administrative cases before said Board does not require that the testimony introduced at the hearings be weighed by the official who heard it and observed the witnesses. What is essential is that before that official makes his report to the Board, if the evidence was not presented before him, he should have read and considered the whole record. Even before the adoption of the provision contained in Regulations of the National Labor Relations Board on the substitution of examiners after the hearing is held, it was determined that said substitution did "not injure the provisions of the due process in violation of the Federal Constitution or of the National Labor Relations Act." Nevertheless, after said provision on substitution was adopted, the power to substitute the examiner who heard the evidence, when he is unavailable, has been limited to those situations "where the credibility evaluation is such that it can be said that it is not necessary or capable of constituting a pertinent factor for the purposes of recommending a decision or issuing a recommended decision." *Morgan* v. *United States*, 298 U.S. 468 (1936); *N.L.R.B.* v. *Mackay Radio & Telegraph Co.*, 304 U.S. 333, 350–351 (1936); *Nat. Labor Relations Bd.* v. *Stocker Mfg. Co.*, 185 F.2d 451 (3d Cir. 1950); *N.L.R.B.* v. *Dixie Shirt Co.*, 176 F.2d 969 (4th Cir. 1949); *Gamble-Skogmo, Inc.* v. *Federal Trade Commission*, 211 F.2d 106 (8th Cir. 1954).

In the state jurisdictions the case law is more lax in permitting the substitutions in question. *Big Top, Incorporated* v. *Hoffman*, 399 P.2d 249, 251 (Colo. 1965); *Cooper* v. *State Bd. of Medical Examiners*, 217 P.2d 630 (Cal. 1950); *Helmick* v. *Industrial Accident Commission*, 116 P.2d 658

(Cal.App.2d 1941). See 2 Davis, Administrative Law Treatise, § 11.18 at 111–117.

■ In *Pacific Molasses Company* v. *F.T.C.*, 356 F.2d 386 (5th Cir. 1966), it was decided that when an administrative agency establishes a rule to govern its procedures, it shall be scrupulously observed. ". . . For once an agency exercises its discretion and creates the procedural rules under which it desires to have its actions judged, it denies itself the right to violate these rules. If an agency in its proceedings violates its rules and prejudice results, any action taken as a result of the proceedings cannot stand." In this case the Federal Trade Commission had adopted the rule that the proceedings be conducted in accordance with the pretrial agreements. In one of the agreements in this case it was stipulated that the Commission would furnish petitioner's attorney with a list of the witnesses for the Commission and the documentary evidence 15 days before trial. The Commission did not abide by this agreement. The court concluded that this prejudiced petitioner's cause due to the fact that it was unable to prepare itself adequately for cross-examination.

■ From the foregoing we infer that the Labor Relations Board, in the absence of the regulation to that effect, is empowered to designate an examiner to prepare and submit, on the basis of evidence heard by another examiner, a report containing the "findings of fact and conclusions of law and recommendations as to what disposition of the case should be made." (29 R.&R.P.R. § 64–10.) The fact that its Regulations provide for the substitution of an examiner by another to sit on the hearing, and that the Board may at any stage during the proceedings transfer any hearing or procedure before itself, does not imply that the Board had divested itself of the power of substituting the examiner who presided at the hearing where all the evidence was intro-

duced in a particular case. The powers specifically prescribed in the regulations in question do not exclude or conflict with said power of substitution. They rather provide for situations different and independent from said substitution. The fact that in the Regulations of the Labor Relations Board and of the Federal Administrative Procedure Act provision was specifically made with respect to substitution of examiners after the hearings were held, should not be construed as if it was done because the Board lacked said power previously. It not only had it but did exercise it. It is evident that it was provided, specifically on that particular for the purpose of insuring that the recommended decision be made by the examiner who heard the evidence. *Gamble-Skogmo, Inc., supra.*

But even assuming that the substitution in this case constituted a violation of the Regulations of the Board, the petitioners did not establish, nor does the record show, that their cause was prejudiced by such action, according to the doctrine in *Pacific Molasses Company, supra.* It was not established either that the substitution did not lie because the credibility evaluation of the witnesses was such that it constituted a pertinent factor for the purposes of the report of the Board's examiner. *Gamble-Skogmo, Inc., supra.* In this case the report of the second trial examiner was based on the complete record of the case "and taking into consideration all the documentary and oral evidence." The Board, through two of its members (the Chairman abstained from participating in the decision in this case) considered said report, the exceptions thereto, and the complete record of the case, for the purposes of the decision and order it entered in this case dismissing the complaint.

The record having been examined, we agree with the Board that the petitioners themselves admitted in the course of their testimony that the persons affected by "the layoffs represented different tendencies in the course of the internal

disputes of the labor organization." Furthermore, the evidence showed that the layoff was the result of a plan previously discussed at length with the Union, in which the relations between the workers to be laid off and the Union played no part. The question of the violation of the collective agreement was not based on the witnesses' testimonies but on the interpretation of subsection (2) of Art. IX thereof. It constituted an unfair labor practice to lay off employee Petterson, but such mistake was corrected in the form and manner the Board would have done, that is, reinstating him in his employment and compensating him for the wages he failed to earn during the brief term of his layoff.

■ 2.—Petitioners allege that the Board erred in refusing to grant them the hearing they requested. The granting of such hearing is discretionary with the Board. The record does not show that the Board abused its discretion in refusing it.[3]

■ 3.—The petitioners argue that the employer violated the collective agreement in force inasmuch as in reemploying the workers laid off it did not take into consideration at all the factor of seniority. The provision applicable is subsection (g) of Art. IX of said agreement.[4]

---

[3] Section 10 of Art. II of the Regulations of the Board (29 R.&R.P.R. § 64–11) reads in part that:

". . . Should any party in the proceeding desire permission to argue orally before the Board, request therefor must be made in writing to the Board within 5 days after the receipt of the report. The Board shall notify the parties of the time and place for said oral argument, if such permission is granted."

[4] Said section reads thus:

"When because of reasons of economy, the Authority needs to reduce the number of shifts scheduled, or close one of the departments in its shops or part thereon, where one or more workers may be affected, the Authority, if there are employments available with equal or similar duties in any other activity of the Authority, shall employ the workers affected and shall pay them the wages those jobs make. The workers shall be employed in accordance with their order of seniority and satisfactory services in general, and in case of a tie in these qualifications, it shall be

The letter of the regulation in question is clear. It provided that when the employer has to make a reduction in personnel by reason of economy, if there are equal or similar employments available when the layoff occurs, the employer shall cover those vacancies with the workers laid off in order of seniority and satisfactory services. But if those vacancies are not available at that moment, the workers laid off shall have priority to be employed "in jobs of this nature" available in the future, provided their records as employees have been satisfactory. The evidence shows that when vacancies occurred in the activities of the employer, it did not only comply with the letter of this provision—the only two available jobs identical to the former ones were covered by two workers laid off previously—but when vacancies in nonidentical work occurred, it also gave priority to the workers who had been laid off.

4.—The assignment based on Petterson's unjustified layoff lacks merit.

In view of the foregoing, the decision and order of the Labor Relations Board of June 20, 1963 shall be affirmed.

decided by drawing lots.

"In case there are no equal or similar openings available, the laid off personnel, as provided by this subsection, shall have priority to be employed preferably in jobs of this nature which might be available in the future, provided their records as employees have been satisfactory."